# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MELVIN MILLER,

     *Plaintiff*,

v.

MARY VELARDE,
KARI CHESTER,
ROSILYN JINDAL,
FARISZER,[1] ROWE, JONES,
and SNEAD,


     *Defendants*.

_____/

Case No. 2:23-cv-12117

Brandy R. McMillion
United States District Judge

Patricia T. Morris
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANTS VELARDE, FARISZER, ROWE, JONES, AND SNEAD'S MOTION FOR SUMMARY JUDGMENT (ECF No. 17); DEFENDANT CHESTER'S MOTION FOR SUMMARY JUDGMENT (ECF No. 28); AND DEFENDANT JINDAL'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (ECF No. 23)

## I.   RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendants Velarde, Frazier, Roe, Jones, and Snead's motion for summary judgment **IN PART**; **GRANT** Defendant Chester's motion for summary judgment **IN PART**; and **GRANT** Defendant Jindal's motion to dismiss or for summary judgment.

---

[1] Although misspelled in both the docket and Miller's complaint, Defendant Fariszer's name is correctly spelled as "Frazier," and Defendant Rowe's name is correctly spelled as "Roe." (ECF No. 15, PageID.44).

1

If adopted, the Court would grant summary judgment in favor of Defendants Velarde and Jindal, dismissing Miller's claims against them without prejudice. The Court would also enter partial summary judgment in favor of the remaining defendants, dismissing Miller's complaint insofar as he alleges that the Defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment by assigning him to a cell that he could only access by climbing a flight of stairs. Only Miller's claim that Frazier, Roe, Jones, and Snead violated his Eighth Amendment rights by assigning him to a top bed bunk would remain.

## II. **REPORT**

### A. Background

Melvin Miller is a former prisoner of the Michigan Department of Corrections ("MDOC"). (ECF No. 1, PageID.6, ¶ 11). Miller sustained a gunshot wound to his leg before his imprisonment. (*Id.* at PageID.5–7, ¶¶ 2, 10, 16, 23). Because this injury continued to interfere with Miller's use of his leg during his incarceration, prison medical staff issued a permanent "special accommodation detail," entitling Miller to a bottom bunk. (*Id.* at PageID.6, ¶ 14). Despite this medical detail, Miller alleges that a group of corrections officers reassigned him to a top bunk, causing him to fall off a six-foot bunk bed and hit "his head on [a] concrete floor." (*Id.* at PageID.5, 7, ¶¶ 2, 23).

Miller alleges that in August 2021, a corrections officer named Frazier instructed him to move to a top bunk in a different cell. (*Id.* at PageID.6, ¶ 12). Miller responded by presenting a copy of his medical detail and informing Officer Frazier that he was entitled to a bottom bunk. (*Id.* at PageID.6, ¶¶ 13–14). After reviewing Miller's medical detail, Frazier consulted another officer, Tyler Roe, who told Frazier that despite the detail, Miller was required to relocate to the top bunk. (*Id.* at PageID.6–7, ¶¶ 15). If Miller did not comply with the order, Roe explained, then Officials would issue a "misconduct report" and punish him with solitary confinement. (*Id.*)

Frazier, Roe, and a third corrections officer named Kari Chester told Miller that they believed his medical detail form to be forged. (*Id.* at PageID.7, ¶ 17). Although Miller explained that a copy of his detail was on file in the "healthcare database," Officer Chester told Miller that she would not allow him to contact medical staff to confirm the validity of his medical detail. (*Id.* at PageID.7, ¶¶ 16, 18).

Miller remained in his cell for another hour before Sergeant Brandon Snead approached him and warned Miller that he would be sent to solitary confinement if he did not "get on the top bunk." (*Id.* at PageID.7, ¶ 20). After Miller presented his medical detail, Snead responded "I don't care about a medical detail and this is your last warning." (*Id.* at PageID.7, ¶ 21).

3

On Snead's orders, Miller entered his newly assigned cell and attempted to climb onto the top bunk. (*Id.* at PageID.7, ¶¶ 22–23). The bunk bed did not have a ladder, and when Miller was "almost . . . on top of" the six-foot bunk bed, his wounded leg "gave out," and he "fell backwards[,] landing on his back and hitting his head on the concrete floor." (*Id.* at PageID.7, ¶ 23). Miller's new cellmate later discovered him on the floor and reported his injury to prison staff. (*Id.* at PageID.7, ¶ 24).

Sergeant Snead responded to Miller's fall alongside a nurse, Mary Velarde. (*Id.* at PageID.8, ¶ 25). But after arriving, they accused Miller of feigning his injury and stated that they would leave the cell if he did not get off the floor. (*Id.*) Although Miller stated that he was in "excruciating pain," Snead and Velarde left him on the floor for over fifteen minutes before "dragging him onto a wheelchair" after Miller asked to be taken to an emergency room "for his neck pain." (*Id.* at PageID.8, ¶ 26). But rather than take Miler to an emergency room, as he requested, Snead and Velarde transported Miller to the prison's healthcare unit. (*Id.* at PageID.8, ¶ 27).

While pushing Miller's wheelchair, Snead and Velarde approached a staircase on their way to the healthcare unit. (*Id.* at PageID.8, ¶ 27). To take Miller down the stairs, Snead and Velarde "lifted" him out of the wheelchair, causing Miller to "yell[] in pain," and sat him down on the top step. (*Id.*) Velarde and Snead then "slid" Miller down the staircase one step at a time. (*Id.* at PageID.8, ¶ 28). To prevent

4

Miller from lying down," Velarde "repeatedly" pushed her knee into Miller's back as she slid him down the stairs. (*Id.*) Velarde returned Miller to his wheelchair and continued to push him towards the healthcare unit once they reached the bottom of the stairs. (*Id.* at PageID.8, ¶ 29). At this time, she began to aim for "potholes and bumps," and would taunt Miller each time she jostled the wheelchair. (*Id.*)

After arriving at the healthcare unit, Miller was evaluated by a physician assistant, Rosilyn Jindal. (*Id.* at PageID.8, ¶ 31). Jindal instructed Velarde to give Miller "a shot for pain" relief and to return him to his housing unit if she believed that Miller was faking his injury. (*Id.* at PageID.8, ¶ 32). Velarde eventually chose to return Miller to his housing unit rather than transport him to an emergency room. (*See id.* at PageID.9, ¶¶ 35–36). But before she did, Lieutenant Roe approached Miller and informed him that staff were able to locate his medical detail and he would be relocated to a cell with an available bottom bunk. (*Id.* at PageID.8, ¶ 33).

Although the prison contained a wing with an elevator prisoners could use to reach their cells, Miller was assigned to a cell that could only be accessed by a flight of stairs. (*Id.* at PageID.9, ¶¶ 35–36). The following morning, Miller fell down the stairs in his housing unit after attempting to "maneuver up the stairs with a [walker]." (*Id.* at PageID.9, ¶ 39).

A few days later, Miller filed a formal grievance regarding his transfer to a top bunk. (ECF No. 17-3, PageID.83, 85). The MDOC provides a three-step,

internal process for prisoners to raise formal complaints. (ECF No. 17-2, PageID.72–74). At step one, a prisoner must "attempt to resolve the issue with the staff member involved within two business days" and, if unsuccessful, must file a "grievance" within five business days. (*Id.* at PageID.69, 71–72). A prisoner's step one grievance must include the "[d]ates, times, places, and names of all those involved in the issue being grieved . . . ." (*Id.* at PageID.71). And, relevant here, the prisoner must not discuss "multiple unrelated issues" in the same grievance. (*Id.* at PageID.69). If the inmate is dissatisfied with the disposition of the step one grievance or does not receive a response ten days after the due date, then he or she may file a step two grievance using the appropriate form. (*Id.* at PageID.73–74). Similarly, if the inmate is dissatisfied with the step two response or does not receive a response for ten days after the response was due, he or she has ten days to file a step three grievance. (*Id.* at PageID.74).

Miller's grievance names Frazier, Chester, Roe, Snead, and two "unknown" nurses. (ECF No. 17-3, PageID.85). The grievance only discusses the events leading up to Miller's fall from the top bunk. Indeed, the grievance does not mention the harsh manner in which Velarde transported Miller to the medical unit, Jindal and Velarde's decision not to send Miller to the emergency room, or Miller's reassignment to a cell that could only be accessed by climbing a flight of stairs. (*Id.*)

The prison's grievance coordinator rejected Miller's grievance at step one, claiming that the grievance contravened the MDOC's policies because it addressed "multiple issues." (*Id.* at PageID.84). Miller appealed his rejection through step three and was denied relief at each level. (*Id.* at PageID.80–83). Miller has not appealed any other grievance through step three. (*See id.* at PageID.77–79).

Miller later filed his complaint in this action, alleging that Velarde, Chester, Jindal, Frazier, Roe, Snead, and another official named "Jones," violated the Eighth Amendment's prohibition of cruel and unusual punishment. (ECF No. 1, PageID.1, 3, 9, 11–12, ¶¶ 43, 53–57). He also alleges that the defendants violated a Michigan statue, Mich. Comp. L. §330.1722(1), and an MDOC policy directive, PD-03.04.100. (*Id.* at PageID.9–10, ¶¶ 44–45).

In December 2023, five of the defendants employed by the MDOC—Velarde, Frazier, Roe, Jones, and Snead—filed a joint motion for summary judgment, arguing that Miller did not exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") before filing his complaint. (ECF No. 17). A few months later, Chester, also employed by the MDOC, joined her codefendants' motion, adopting their brief by reference. (ECF No. 28). In addition, Nurse Jindal, a former employee of a private medical provider contracted by the MDOC, has moved for summary judgment on the grounds that Miller did not exhaust his claims

against her before filing his complaint.  (ECF No. 23).  Miller has not responded to these motions despite having been ordered to do so.  (*See* ECF Nos. 18, 24, 29).

## B. Summary Judgment Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that would affect "the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ."  *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact could find in its favor."  *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Carver v. Bunch*, 946

8

F.2d 451, 454–55 (6th Cir.1991).  So even where a summary judgment motion is unopposed, the Court still must scrutinize the motion to determine whether the moving party has met its burden.  *Id.*

### C.    Discussion

Under the PLRA, prisoners may not bring actions against prison officials to challenge the conditions of their confinement without first exhausting their administrative remedies.  42 U.S.C. § 1997e(a) (2018); *Porter v. Nussle*, 534 U.S. 516, 523 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001).  And not only must prisoners exhaust their administrative remedies before filing a complaint, but they must do so "properly," meaning that they must "compl[y] with an agency's deadlines and other critical procedural rules . . . ."  *Woodford v. Ngo*, 548 U.S. 81, 90, 92 (2006).

Each defendant here moves for summary judgment on the grounds that Miller did not properly exhaust his administrative remedies before filing his complaint.

### 1.    The MDOC Defendants' Motions for Summary Judgment

The MDOC defendants concede that Miller exhausted his claims against them.  (ECF No. 17, PageID.63).  Even so, they argue that the Court must grant summary judgment in their favor because Miller did not exhaust his administrative remedies "properly."  (*Id.* at PageID.63–64; *see also* ECF No. 28).

9

The MDOC's grievance policies provide that a step one grievance may not raise "multiple unrelated issues." (ECF No. 17-2, PageID.69). Applying this rule, the MDOC's grievance coordinator rejected Miller's step one grievance in its entirety for raising "multiple issues," and the MDOC upheld this determination on appeal. (ECF No. 17-3, PageID.80, 82, 84). The grievance coordinator did not explain why he understood Miller's grievance to raise multiple issues. (*Id.* at PageID.84). Nor, for that matter, does the Assistant Attorney General. (ECF No. 17, PageID.63–64). Rather, Defense Counsel argues that because the grievance coordinator determined that Miller did not properly file his step one grievance, so too, must the Court. (*Id.*) In other words, Defense Counsel suggests that the Court may not scrutinize the State's application of its own procedural rules—whenever a grievance is rejected on procedural grounds, the prisoner has not properly exhausted his or her administrative remedies. (*Id.*)

Not so. The Court need not "blindly accept the state's application of [a] procedural rule." *Reeves v. Salisbury*, No. 11-cv-11830, 2012 WL 3206399, at *5 (E.D. Mich. Jan. 30, 2012); *see also Roden v. Floyd*, No. 2:16-cv-11208, 2018 WL 3259806, at *6 (E.D. Mich. Jan. 31, 2018). When the Supreme Court held that prisoners must "properly exhaust their administrative remedies in *Woodford v. Ngo*, it understood "proper exhaustion" to describe completion of an "administrative review process in accordance with the applicable procedural rules." 548 U.S. at 88.

It did not, as Defense Counsel suggests, understand a properly exhausted grievance to simply refer to a grievance that was not rejected on procedural grounds. *Id.* That is, *Ngo* instructs courts to conduct an objective inquiry into whether the prisoner complied with the state's procedural rules, not a subjective inquiry into whether the state believed the grievance to be procedurally defective. *Williams v. Winn*, No. 18-11060, 2019 WL 2252012 at *6 (E.D. Mich. Feb. 27, 2019).

Looking past the MDOC's perfunctory rejection, it is difficult to see how Miller's grievance raises "multiple unrelated issues." Begin with what it means for a grievance to contain "unrelated issues." What constitutes a single, discrete issue? And just how different must two issues be before they are unrelated? The MDOC's policy directive leave these questions open. And in doing so, the policy invites abuse from prison officials. (ECF No. 17-2). Indeed, in nearly all cases, officials can reject a grievance for raising multiple unrelated issues just by defining an "issue" at ever-increasing levels of particularity. *E.g.*, *Bagley v. Jamros*, No. 2:20-cv-150, 2021 WL 6550837, at *5–6 (W.D. Mich. Dec. 20, 2021). So too, creative officials can almost always pinpoint subtle differences between issues in a grievance to show that they are not "related." Such narrow interpretations of the policy "bar all but the most artfully-drafted grievances from receiving decisions on the merits." *McDuff v. Addis*, No. 1:17-CV-912, 2018 WL 3239491, at *3-4 (W.D. Mich. July 3, 2018). Prisoners, faced with officials who apply the directive at the highest possible level

of particularity, would need to "walk a tightrope—stating sufficient information in their grievance to receive a merits determination . . . while omitting everything else that MDOC officials could plausibly seize on to deem the grievance as raising multiple unrelated issues." *Id.*

For these reasons, the Court should not read the policy-directive to define an "unrelated issue" at too fine a level of generality. A prisoners may, for example, describe multiple, discrete injuries that arose from a single claim. *LaFountain v. Martin*, 334 F. App'x 738, 740–41 (6th Cir. 2009); *Freeman v. Homes*, No. 1:19-cv-728, 2020 WL 4194483, at *5 (W.D. Mich. June 24, 2020). Likewise, a single grievance may discuss a pattern of conduct or multiple, discrete actions that underly a broader dispute or problem. *See McDuff*, 2018 WL 3239491, at *2; *e.g.*, *Cheatham v. Haye*, No. 2:19-cv-10480, 2020 WL 3481645, at *4 (E.D. Mich. June 26, 2020). Only issues that are "completely unrelated" must be raised in separate grievances. *Reeves*, 2012 WL 3206399, at *5; *e.g.*, *Crump v. Caruso*, No. 2:09-CV-194, 2010 U.S. Dist. LEXIS 97492, at *9 (Sept. 17, 2010); *see also McDuff*, 2018 WL 3239491, at *2 (explaining that issues are unrelated if they are "not connected or associated").

Miller's grievance does not raise multiple issues. True, Miller discusses the chain of events surrounding his transfer, starting with Officer Frazier's order that he move to a top bunk in a different cell and ending with his account of officials taunting him after he fell from his newly assigned bunk. (ECF No. 17-3, PageID.85).

12

He also describes the actions of multiple officials involved in his transfer, and he references both the injury he sustained and the officials' initial reaction.  (*Id.*)  But these are all aspects of a single issue: Miller's transfer to a top bunk in contravention of his medical detail.  (*Id.*); *cf. LaFountain*, 334 F. App'x at 740–41; *Cheatham*, 2020 WL 3481645, at *4.  And even if the Court could dissect Miller's grievance into multiple issues (perhaps by construing the actions of each defendant as a distinct "issue"), the issues addressed in Miller's grievance are not so "completely unrelated" that they must be addressed in separate grievances.  *Reeves*, 2012 WL 3206399, at *5.  Thus, I recommend that the Court deny summary judgment in favor of the MDOC defendants (Mary Velarde, Kari Chester, Frazier, Roe, Jones, and Snead) on the basis that Miller did not properly exhaust his administrative remedies.[2]

### 2.    Whether Moore Exhausted his Claims against Jindal

While her MDOC codefendants concede that Miller exhausted his claims against them and instead challenge his compliance with the MDOC's procedural requirements, Jindal raises a more fundamental issue.  Miller, she argues, did not even exhaust—let alone, properly exhaust—his claims against her by pursuing a grievance through the MDOC's entire three-step process.  (ECF No. 23, PageID.108–10).

---

[2] For reasons discussed below, the Court should still enter summary judgment in favor of Velarde.  *See infra* Part II.C.3.

Miller's claims against Jindal concern the adequacy of her medical treatment following Miller's injury.  In particular, Miller alleges that Jindal violated his Eighth Amendment rights by (1) instructing Velarde to return Miller to his cell rather than transport him to the emergency room, under the belief that Miller was "faking" his injury; (2) by preventing him from obtaining a "proper diagnosis" for his injury; and (3) by failing to reassign him to an "elevator wing" in the prison following his injury, causing him to eventually "fall down several flights of stairs."  (ECF No. 1, PageID.8–12, ¶¶ 31–32, 35–39, 50, 54, 56).[3]

While Miller's claims against Jindal concern the adequacy of his medical treatment *following* his injury, his only exhausted grievance concerns the conditions that *led to* his injury.  (ECF No. 17-3, PageID.83, 85).  Indeed, Miller's grievance claims only that a group of officials disregarded his medical detail by reassigning him to a top bunk.  (*Id.*)  It does not mention Jindal's refusal to send him to the emergency room, her failure to "diagnose" his injury, or her refusal to assign him to a housing unit without stairs.  (*Id.*)

---

[3]  Miller's complaint contains perfunctory allegations that "[a]ll defendants" were responsible for his transfer to a top bunk.  (*Id.* at PageID.10–11, ¶¶ 46, 52, 55).  Yet he alleges no facts demonstrating how Jindal was personally involved in the decision to move him to a top bunk.  For that reason, I recommend that the Court liberally construe Miller's complaint to allege only that the corrections officers ignored his medical detail.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  In the alternative, the Court should screen this claim for failure to allege Jindal's personal involvement, as required under § 1983.  *See Powers v. Hamilton Cty. Pub. Def.*, 501 F.3d 592, 608 (6th Cir. 2007); 42 U.S.C. § 1997e(c)(2); 28 U.S.C. § 1915(e)(2)(B)(ii).

It is axiomatic that proper exhaustion of a prisoner's administrative remedies only serves to exhaust the issues pursued at the administrative level. *See Jones v. Bock*, 549 U.S. 199, 220 (2007); 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until such administrative remedies as are available are exhausted.")  Prisoners cannot grieve some issues and then tack entirely new, unexhausted issues on to their pleadings; the issues raised in the grievance must match the claims raised in the complaint. *See Ford v. Martin*, 49 F. App'x 584, 585 (6th Cir. 2002), *abrogated on other grounds by Jones*, 549 U.S. at 216; *Baldridge-El v. Gundy*, No. 99-2387, 2000 WL 17210124, at *1 (6th Cir. Nov. 8, 2000).  So to exhaust a claim against a prison official, a prisoner's grievance must "allege" some "unconstitutional act or omission" by the eventual defendant. *McDuff v. Willard*, No. 1:22-cv-20, 2023 WL 2499025, at *1 (W.D. Mich. Mar. 14, 2023).

Because the only grievance in Miller's record does not relate to his claims against Jindal, did not exhaust these claims before filing his complaint. (*See* ECF No. 17-3, PageID.77–79).  Thus, I recommend that the Court enter summary judgment in favor of Jindal and dismiss Miller's claims against her without prejudice.[4] *See Boyd v. Corrs. Corp. of Am.*, 380 F.3d 989, 994 (6th Cir. 2006).

---

[4] In the alternative, Jindal moves the Court to dismiss Miller's claims against her under Federal Rule of Civil Procedure 12(b)(6) for failure to state a plausible claim for relief. (ECF No. 23, PageID.106–08).  Because Miller did not exhaust his administrative remedies as to Jindal, the Court need not reach the merits of his claims against her.

### 3.    Defendant Velarde

Like Jindal, Miller's sole grievance does not encompass his claims against Velarde.  Indeed, Miller's claims against Velarde concern the rough manner in which she transported him to the healthcare unit and her refusal to transport him to the emergency room, whereas his grievance addresses only his reassignment to a top bunk.  (ECF No. 1, PageID.8, 10–11, ¶¶ 29–32, 49–50, 54, 56).[5]

Defense Counsel does not raise this issue.   Rather than argue, in the alternative, that Miller did not file any grievances concerning his claim against Velarde, Counsel moves for summary judgment exclusively on the grounds that Miller's grievance did not comply with the prison's procedural requirements.  (ECF No. 17, PageID.63–64).  In fact, Counsel even concedes—mistakenly—that Miller's grievance "concerns the claims asserted in this lawsuit . . . ."  (*Id.*)

Counsel's failure to present this issue does not necessarily preclude the Court from reaching it.  Federal Rule of Civil Procedure 56(f) allows the Court to enter summary judgment in favor of a party on "grounds not raised" in the party's motion, provided that the Court first notify the nonmovant and allow a "reasonable time to

---

[5] Like his claims against Jindal, Miller alleges no facts demonstrating how Velarde was personally involved in the decision to move him to a top bunk, despite accusing all defendants of involvement in this decision.  As with Jindal, I recommend that the Court liberally construe Miller's complaint to allege only that the corrections officers ignored his medical detail, or, in the alternative, screen this claim for failure to allege Velarde's personal involvement.  *See Haines*, 404 U.S. at 520; *Powers*, 501 F.3d at 608 (6th Cir. 2007).

16

respond." That notice, however, need not be explicit. *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F..4th 474, 481 (10th Cir. 2023); *accord* 11 Moore's Federal Practice-Civil § 56.71[b] (Matthew Bender 3d ed. 2023). The nonmovant need only have known "that [it] had to come forward with all of [its] evidence" on the issue raised by the district court before the Court entered judgment against it. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (quoting *Celotex*, 477 U.S. at 326) (internal quotation marks omitted); *see also George v. Youngstown State Univ.*, 966 F.3d 446, 467 (6th Cir. 2020).

For a few reasons, Miller was notified that the Court could enter summary judgment in favor of Velarde on the grounds that Miller filed no grievance regarding his claim against her. First, Velarde's motion should have notified Miller that he needed to have come forward with all of his evidence showing that he filed a grievance encompassing his claim. The issue of whether Miller exhausted his administrative remedies against Velarde is logically antecedent to the issue of whether he did so properly. *Cf. Lebron v. Nat. R.R. Passenger Corp.*, 513 U.S. 374, 379–80 (1995); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99–100 (1991). That is, Miller cannot prove that he complied with the MDOC's grievance procedures as to his claim against Velarde without first establishing that he "exhausted" his claim against Velarde. *See Ngo*, 548 U.S. at 90–91. Because Miller could not rebut Velarde's motion without first proving that he exhausted his

administrative remedies as to his claims against her, he should have known to present evidence of a such a grievance in response to her motion.

True, Miller may have assumed that the Court would accept Counsel's concession that Miller's sole grievance addressed his claim against Velarde, and thus he need only have showed that his grievance did not address "multiple unrelated issues." (ECF No. 17-2, PageID.69).  What is obvious to a lawyer, after all, may not be clear to an unrepresented prisoner.  But even if this were so, Miller could not have shown that his grievance concerned "related" issues without stating what those issues were.  By identifying the issues addressed in his grievance, Miller should have noticed the discrepancy between his grievance and his claim for relief.

And even if Velarde's motion failed to notify Miller of this issue, Miller should have become aware of it after reading Jindal's motion, which reveals an identical deficiency in Miller's grievance. (ECF No. 23, PageID.103, 109).  Because Jindal's argument that Miller declined to pursue his administrative remedies for any conduct following his fall from the top bunk applies equally to Velarde, Jindal's motion should have notified Miller that the Court might grant summary judgment in favor of Velarde on the same grounds.  *Cf. Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384–385 (7th Cir. 2008); *Couden v. Duffy*, 446 F.3d 483, 491 (3d Cir. 2006); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999).

Further, whether notified of this issue by Velarde's motion or by Jindal's motion, Miller had sufficient time to present evidence on this issue or request additional time to conduct discovery. Indeed, the Court allowed Miller four weeks to respond to Velarde's motion. (*Compare* ECF No. 17, *with* ECF No. 18). And while Jindal did not move for summary judgment until two days after Miller's response to Velarde was due, Miller could have requested leave to file an additional brief. *See* E.D. Mich. LR 7.1(b)(2). Yet Miller chose not to respond to either motion. So, because Miller was on notice that the Court may enter summary judgment in favor of Velarde on the grounds that Miller's grievance does not address his claim against her, and because Miller has had adequate time to address that question, Rule 56(f)(2) allows the Court to address the issue on its own accord. *George*, 966 F.3d at 467.

Yet this case presents an additional wrinkle. Rule 56(f)(2) may provide a mechanism for the Court to raise this issue *sua sponte*, but exhaustion is an affirmative defense. *Jones*, 549 U.S. at 216. And like any other affirmative defense, state officials bear the burden of both presenting and proving a prisoner-plaintiff's failure to exhaust his or her administrative remedies. *Id.* Plaintiffs ordinarily need not disprove affirmative defenses that have not been established—much less presented—by a defendant. *Id.* For that reason, courts generally cannot raise affirmative defenses on their own accord. *Maalouf v. Islamic Republic of Iran*, 923

F.3d 1095, 1109 (D.C. Cir. 2019) (citing *United States v. Mitchell*, 518 F.3d 740, 748 (10th Cir. 2008)); *see Arizona v. California*, 530 U.S. 410, 413 (2000). But to enter summary judgment here on a different theory than that proposed by Velarde would be to raise an affirmative defense on her behalf.

Although the "standard procedure" is for courts to wait for parties to present an affirmative defense or deem that defense forfeited, this is not an "inflexible" edict. Justin C. Van Orsdol, *The New Qualified Immunity Quandary*, 100 Neb. L. Rev. 692, 711 (2022); *see also United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("The party presentation principle is supple, not ironclad."). Indeed, it is common practice for courts, when empowered to dispose of claims *sua sponte* by some statutory vehicle, to dismiss claims based on unraised affirmative defenses. *See, e.g.*, *Lorenz v. Rushiney*, No. 2:23-CV-11040, 2023 WL 3794501, at *2 (E.D. Mich. June 2, 2023) (collecting cases). Provided that the plaintiff receives adequate notice, courts may raise an affirmative defense on a party's behalf under two conditions. First, the defendant must not have knowingly waived the defense by failing to raise it. *Day v. McDonough*, 547 U.S. 198, 202 (2006); *see also Summe v. Kenton Cty. Clerk's Office*, 604 F.3d 257, 269–70 (6th Cir. 2010). Second, the defense at issue must be one that the Court has an independent interest in enforcing. *Day*, 547 U.S. at 205; *Arizona*, 530 U.S. at 412; *Maalouf*, 923 F.3d at 1110–11. Both elements are met here.

### a.   Waiver

Begin with waiver.   Courts may not, on their own motion, resurrect an affirmative defense that a party has waived.   *Wood v. Milyard*, 566 U.S. 463, 472–73 (2012); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1278 & n.21.   But waiver should not be confused with forfeiture.   A waived "defense is one that a party has knowingly and intelligently relinquished." *Wood*, 566 U.S. at 470 n.4; *see also Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 17 n.1 (2017).   A forfeited defense, on the other hand, is one that a party merely overlooks.   In essence, "the difference between waiver and forfeiture is the difference between intent and neglect." *Bannister v. Knox Cty. Bd. Of Ed.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).   Unlike waived defenses, courts have discretion to raise forfeited defenses in "exceptional circumstances."   *Id.* (quoting *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993)) (internal quotation marks omitted).   And even where a district court declines to consider a forfeited defense, the party who forfeited the defense may still raise it at a later time.   *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 752 (6th Cir. 2015).[6]   Thus, for example, a party who forfeits an affirmative defense on a summary judgment motion may later raise the defense at trial.   *Henricks*, 782 F.3d at 752.

---

[6] The Panel in *Henricks* uses the term "waiver" where it means to say "forfeiture." *Wheatt v. City of East Cleveland*, 741 F. App'x 302, 305 n.4 (6th Cir. 2018); *see ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 507 (6th Cir. 2022).

When is an affirmative defense "knowingly" waived rather than unintentionally forfeited?  Consider, for example, *Summe v. Kenton County Clerk's Office*.  In *Summe*, a district court held, on its own initiative, that a defendant was protected by qualified immunity.  604 F.3d at 269.  Although the defendant raised qualified immunity in his answer, he did not address the defense in either his motion for summary judgment or his reply brief.  *Id.* at 296–70.  To the Sixth Circuit, this demonstrated that the defendant "was aware of" the defense and intentionally "chose" to abandon it.  *Id.*  Thus, the district court abused its discretion in raising the defense on his behalf.  *Id.*; *see also Easley v. City of Riverside*, 765 F. App'x 282, 284 (Graber, J., concurring).  By contrast, in *Day v. McDonough*, the Supreme Court held although a party failed to raise a statute of limitations defense, it did so because it had miscalculated the applicable tolling period and thus did not "deliberate[ly]" waive the defense.  547 U.S. at 201–02.  *See also Henricks*, 782 F.3d at 750–52.

As in *Day*, Velarde's attorney appears to have simply overlooked that Miller's grievance does not encompass his claims against Velarde.  Counsel mischaracterizes Miller's complaint as alleging only that the defendants did not follow [Miller's] long-standing bottom-bunk detail," failing to recognize that his claims against Velarde and Jindal concern conduct that occurred after he fell from his top bunk.  (ECF No. 17, PageID.54).  And apart from his usual canned brief, Counsel devotes just three sentences of original argument to all six of his clients.  (*Id.* at PageID.63–

64).  By all indications, Counsel rushed through his briefing without first carefully parsing Miller's complaint.  Thus, he appears to have omitted this argument because he neglected to read all of Miller's complaint—not because he intentionally waived it.  In other words, Counsel only forfeited the argument that Miller did not exhaust his administrative remedies regarding his claims against Velarde.  *See Bannister*, 49 F.4th 1000, 1011–12.  Thus, provided that this defense is one that the Court has an independent interest in addressing, the Court has discretion to grant summary judgment in favor of Velarde.

### b.    The Court's Interest in Raising Miller's Failure to Exhaust

A freewheeling practice of raising affirmative defenses on behalf of litigants would "erod[e] the principle of party presentation so basic to our system of adjudication."  *Arizona*, 460 U.S. at 412–13.  So while the principle that courts should not raise affirmative defenses *sua sponte* is a malleable one, exceptions to this rule are "cabined and rare."  *Maalouf*, 923 F.3d at 1109–10.  Only affirmative defenses that further an important, institutional interest of the judiciary may be considered on a court's own initiative.  *See Wood*, 566 U.S. at 473; Orsdol, *supra*, at 712 & n.126 (citing *Hines v. United States*, 971 F.2d 506, 509 (10th Cir. 1992)).  In other words, only affirmative defenses that implicate "values beyond the concerns of the parties"—such as judicial economy, finality of judgments, and comity

between state and federal courts—may be addressed *sua sponte* unless waived by a

defendant.  *Day*, 547 U.S. at 1681 (internal quotation marks omitted).

The Supreme Court has had few occasions to address the propriety of courts

raising affirmative defenses *sua sponte*.  Indeed, most of its decisions on this issue

arise from habeas petitions.  And in that context, the Court has consistently held that

threshold, procedural defenses—such as exhaustion of state remedies, statutes of

limitations, procedural default, and nonretroactivity—implicate interests beyond the

concerns of the parties, such as avoiding judicial waste, safeguarding the finality of

judgments, and fostering comity.  *Id.* at 205; *Wood*, 566 U.S. at 470–73.

Outside the context of habeas petitions, the Court has held that collateral

estoppel and res judicata may be addressed *sua sponte*, as these defenses not only

relieve defendants of the need to "twice defend[]" against the same "suit," but also

avoid "'unnecessary judicial waste.'"  *Arizona*, 530 U.S. at 412 (quoting *United

States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)).

So too, lower courts often hold that threshold, procedural defenses may be

addressed *sua sponte*.  The Sixth Circuit, for instance, holds that courts in ordinary

civil litigation may *sua sponte* grant summary judgment on the grounds that a claim

exceeds the statute of limitations.  *Grand Rapids Plastics, Inc.*, at 407 (citing

*Celotex*, 477 U.S. at 326); *see also Thomas v. Mahoning Cty. Jail*, 2017 WL

3597428, at *2 (6th Cir. 2017).  Likewise, district courts in this Circuit routinely

screen claims filed by prisoners and *in forma pauperis* plaintiffs where an affirmative defense, such as a statute of limitations, is apparent from the face of the complaint. *E.g.*, *Lorenz v. Rushiney*, No. 2:23-CV-11040, 2023 WL 3794501, at *2 (E.D. Mich. June 2, 2023) (citing *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017)); *Gilbert v. Schuette*, No. 14-CV-11099, 2014 WL 2208089, at *2 (E.D. Mich. May 28, 2014). That is because Congress enacted *in forma pauperis* statute and the PLRA's screening requirements under the belief that prisoners and IFP plaintiffs are prolific filers of frivolous complaints. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998). So to mitigate the potential for widespread waste of judicial resources, courts may assume that defendants will not waive an affirmative defense already teed up by their opponent and raise these issues on their own accord. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655–57 (4th Cir. 2006).

Not all affirmative defenses implicate institutional concerns. Except in cases brought by prisoners, *in forma pauperis* plaintiffs, or habeas petitioners, the primary purpose of nonjurisdictional statutes of limitations are "to protect defendants against stale or unduly delayed claims." *Maalouf*, 923 F.3d at 465 (internal quotation marks omitted); *see also Eriline*, 440 F.3d at 655. Likewise, qualified immunity serves only to advance the interests of government defendants—often to the detriment of judicial efficiency. Orsdol, *supra*, at 177–12; *see Mitchell v. Forsyth*, 472 F.3d 511,

530 (1985) (holding that government defendants may file interlocutory appeals whenever denied qualified immunity).  Because neither defense affects judicial interests beyond the concerns of litigants, neither may be raised on a court's own initiative.

Unlike these two defenses, the PLRA's exhaustion requirement primarily serves to protect scarce judicial resources from a flood of frivolous prisoner litigation.  Congress enacted the PLRA to curtail what it perceived as an explosion of meritless prisoner lawsuits clogging the courts and wasting judicial resources.  *See Jones*, 549 U.S. at 203–04.  As a result, meritorious prisoner cases became buried in a pile of meritless claims, requiring courts to search for "needles" in "haystacks." *Id.* at 224.  To address this problem, the Act established several rules designed to both "reduce the quantity and improve the quality of inmate suits," while simultaneously "eliminat[ing] unwarranted federal-court interference with the administration of prisons."  *Porter*, 534 U.S. at 524; *Ngo*, 548 U.S. at 93.  One of these rules requires prisoners to fully exhaust their "available" administrative remedies before filing an action concerning the "conditions" of their confinement. 42 U.S.C. § 1997e(a).

Exhaustion advances the PLRA's overall goal of filtering prisoner litigation in three ways.  First, it affords "corrections officials time and opportunity to address complaints internally . . . thereby [potentially] obviating the need for litigation."

*Porter*, 534 U.S. at 525.  Second, exhaustion allows prisons to "filter out some frivolous claims" through their "internal review" processes.  *Id.* (internal quotation marks omitted) (quoting *Booth v. Churner*, 532 U.S. 731, 737 (2001)).  And third, exhaustion builds "an administrative record that clarifies the contours" of controversies that are "ultimately brought to court."  *Id.*  In essence, exhaustion allows prison officials an opportunity to resolve disputes before that burden must fall on the courts.  *See id.*  Thus, the requirement that prisoners exhaust their administrative remedies implicates an important, institutional interest in avoiding judicial waste.  *See Jones v. Bock*, 549 U.S. 199, 214–15 (2007).[7]

Aside from its interest in preserving judicial economy, the Court also has an interest in addressing all issues fairly included within the argument presented by Velarde.  *See* Jeffrey M. Anderson, The Principle of Party Presentation, 70 Buff. L.

---

[7] Counsel also fails to argue that Miller's grievance does not name all involved parties, as required by MDOC policy.  Although Miller now identifies Officer Jones as one of the corrections officers who ignored his bottom-bunk medical detail, he does not identify Officer Jones in his grievance, either by name or by description.  (ECF No. 17-3, PageID.85); *see Mahaffey v. Buskirk*, No. 13-14646, 2014 WL 2864099, at *12 n.13 (E.D. Mich. June 24, 2014).  Likewise, the grievance coordinator, despite knowing that Miller targeted his grievance at unidentified "medical staff members," chose not to raise this defect as a basis for rejecting Miller's grievance.  (ECF No. 17-3, PageID.84–85).  While exhaustion primarily serves the interests of the courts, the condition that a prisoner properly exhaust ensures that the state has a "fair opportunity to consider" the inmate's grievance.  *See Ngo*, 548 U.S. at 95; *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324–25 (6th Cir. 2010).  Because the MDOC does not assert that Miller's failure to name all involved parties prevented it from considering the merits of Miller's grievance, neither should the Court.  *See Reed-Bey*, 603 F.3d at 324–25.

Rev. 1029, 1094–1100 (2022).  Again, the Court must first determine whether Miller

pursued any administrative remedies regarding his claims against Velarde before it

can decide whether Miller pursued those grievances "properly."  And in doing so,

the Court need not accept the Assistant Attorney General's erroneous interpretation

of Miller's complaint.  Indeed, the Supreme Court has repeatedly held that courts

may raise issues that are necessary to resolve arguments raised by the parties.  *E.g.*,

*U.S. Nat'l Bank or Oregon v. Ind. Ins. Agents of Am.*, 508 U.S. 439, 446–47 (1993);

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99–100 (1991).  Once a party raises

an affirmative defense, "the court is not limited to the particular legal theories

advanced by" the movant.  *Kamen*, 500 U.S. at 99.  Rather, it "retains the

independent power to identify and apply the proper construction of governing law."

*Id.*

　　At bottom, the Court has an independent interest in raising, on its own motion,

the issue of whether Miller's grievance encompasses his claims against Velarde, and

Velarde has not waived this issue.  Because Miller has received sufficient notice that

the Court could enter summary judgment on this basis, the Court should exercise its

discretion to find that Miller failed to exhaust his administrative remedies as to his

claim against Velarde and enter summary judgment Velarde's favor.[8]

---

[8] For similar reasons, I recommend that the Court dismiss Miller's claim that each
Defendant subjected him to cruel and unusual punishment in violation of the Eighth
Amendment by assigning him to a cell that he could only access by climbing a flight of

**C. Conclusion**

For these reasons, **I RECOMMEND** that the Court **GRANT** Defendants Velarde, Fariszer, Row, Jones, and Snead's motion for summary judgment **IN PART**; **DENY** Defendant Chester's motion for summary judgment; and **GRANT** Defendant Jindal's motion to dismiss or for summary judgment.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant

---

stairs.  (ECF No. 1, PageID.10–12, ¶¶ 48, 55; *see also id.* at PageID.9, ¶¶ 36–42).  Like his complaints against Jindal and Velarde, this issue is not referenced in his grievance.  (ECF No. 17-3, PageID.83, 85).

to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 13, 2024                         s/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge